**Louis Vernon THOMAS, Appellee,**

v.

**Sharon Lynn Ford SWANSON, Appellant.**

**No. 88–2670.**

United States Court of Appeals, Eighth Circuit.

Submitted April 13, 1989.

Decided Aug. 1, 1989.

J. Thomas Sullivan, Little Rock, Ark., for appellant.

Jeff Dobbins, Mountain View, Ark., for appellee.

Before ARNOLD and MAGILL Circuit Judges, and BRIGHT, Senior Circuit Judge.

ARNOLD, Circuit Judge.

Sharon Lynn Ford Swanson appeals the District Court's [1] decision to grant one-half of the proceeds from her deceased son John's Servicemen's Group Life Insurance policy to John's father, Louis Vernon Thomas. Swanson and Thomas were defendants in an interpleader suit brought by Prudential Insurance Company of America

---

1. The Hon. John Forster, Jr., United States Magistrate for the Eastern District of Arkansas, tried this case by agreement of the parties, under 28 U.S.C. § 636(c).

to determine the proper beneficiary of one-half of John Vernon Thomas's life-insurance proceeds. Swanson seeks to disqualify Thomas as a beneficiary under 38 U.S.C. § 765(9), arguing that Thomas abandoned the child and willfully failed to support him during his minority. If successful, Swanson would receive the full proceeds of the $50,000 life-insurance policy, for which John did not designate a beneficiary, rather than only half that amount.

On appeal, Swanson contests the Magistrate's decisions regarding the statutory terms "abandoned" and "willfully failed to support," as well as the determination that several years' worth of benefits paid to John by the Social Security Administration for his father's permanent and total disability should count as support, and the Magistrate's use of a "clear evidence" standard to evaluate her claims. We agree with Swanson's last argument that § 765(9) does not require her to prove her case by clear and convincing evidence, and that proof by a preponderance of the evidence would suffice. Ordinarily, we would remand for new fact-finding under the correct standard of proof. However, having reviewed the entire record, we conclude that Swanson's evidence cannot satisfy even the less exacting preponderance standard with respect to either abandonment or willful non-support. We further hold that the Magistrate correctly counted the Social Security disability benefits towards Thomas's support of his child. Hence, we affirm the trial court's decision without remanding the case.

## I.

Swanson and Thomas first met in 1963, and they began living together when they discovered that Swanson was pregnant with John.[2] John Vernon Thomas was born on October 17, 1963, and a second child, Traci Lynn Thomas, was born to the couple on September 29, 1964. Louis Vernon Thomas supported the family, working for a construction company while Swanson attended beautician's school. In January 1965, according to Swanson's testimony, she separated from Thomas because they "couldn't get along." Tr. 55. He then came to see her a few times, and they reunited when "[h]e told me that he wanted to marry me and make a home and everything for the kids and I...." *Id.* On May 30, 1965, the couple "married," but the marriage was invalid because Thomas was still married to Levita Green, who had served him with divorce papers that did not result in a final divorce decree until June 28, 1965.

A short while after their attempted marriage, Swanson and Thomas quarreled again. Thomas testified that he had been working seven days a week to cover the family's bills and came home exhausted. Tr. 36. Swanson testified that she discovered papers Thomas had just received indicating that the divorce was not final. Tr. 56. Both Thomas and Swanson testified that he broke a couple of lamps during the course of the argument, and Swanson stated that she was afraid of him, and that the children "had gotten into some of the glass and were crying and upset." Tr. 56, 36. While Swanson's reaction may have been understandable and reasonable, there is no dispute that *she* was the one to leave with the children the following day, moving them and their belongings to the home of her mother, Muriel Satterfield.

Swanson and the children lived with Satterfield "off and on" for approximately two years while Swanson's "love affairs waxed and waned." Tr. 104 and *Prudential Insurance Co. of America v. Thomas and Swanson*, No. B–C–88–15, slip op. at 3 n. 2, 1988 WL 131650 (September 30, 1988). During that period, Thomas made several attempts to reconcile and was repeatedly rebuffed by Swanson and her mother. He managed to speak with Swanson a few times, and she allowed him to see their son once, Tr. 22, 29, but in most instances, the police told him to leave while he was still in his vehicle parked outside the house. Both Swanson and her mother, who worked for the police department, asked for help from the police keeping Thomas away from the

---

**2.** Although the couple was not married at John's birth, Thomas is listed as the father on John's birth certificate, Tr. 4–5, and paternity is not a contested issue in this case.

property. Tr. 71–72, 103. Thomas testified that he was afraid to venture up to the door, and would simply wait in his car or truck until asked to leave. He also testified, "I was so depressed. I wanted to hold my kids. I wanted back with her." Tr. 29–30. Swanson did not want him around and prevented him from seeing the children, according to her own testimony and that of her mother. Tr. 58, 103–04. When Thomas called on the telephone to speak with Swanson or to locate her, Satterfield would tell him " 'I don't know where they're at' " and hang up. Tr. 40, 103, 120.

After a few months of unsuccessful attempts to reconcile, Thomas came to Swanson and told her he was going to move. Swanson claims that when they separated, she asked him for help supporting the children, and that he replied "no, ... he was going to leave the area, ... I would never see or hear from him again, and there was no way that I could ever get any support from him for the children because we were never legally married." Tr. 60. Swanson argues that Thomas abandoned the family at that point, in that she had no idea where he moved to and not a clue about where to start looking for him. Tr. 70, 73. She explained to the trial court that she did not have the resources to hire private detectives to track down Thomas. Tr. 73.

There is no indication that Swanson actually had any desire to locate Thomas, having deliberately evaded him while he still lived in the same town. In fact, her mother and her daughter Traci testified that Swanson had never tried to locate Thomas or help him locate her, to their knowledge. Tr. 113, 136. Moreover, Thomas first moved to his mother's home in San Diego, an address with which Swanson was familiar. Tr. 27–28. When he next moved to Las Vegas, he tried to contact Swanson by telephone, but he could never get through, according to his testimony, because Satterfield would not allow him to talk to her daughter. Tr. 28. Thomas made a trip back from Las Vegas to meet Swanson at the restaurant where she worked and attempted to reunite with her and the children. Tr. 39. He remembered that on that occasion, she told him " 'Forget it. You're never going to see the kids no more,' and she just laughed at me," until Thomas went outside and a sheriff suggested that he " '[g]o contact them by mail,' but ... 'get out of here because they're after you.' " Tr. 33. Satterfield corroborated Thomas's account by testifying that her daughter "was really laughing" when she described the encounter, as if it were "a big joke ... how she had really told him off and put him on his way." Tr. 115, 117, 134.

Both Thomas and Swanson made several other moves, he traveling from Las Vegas to Florida, back to San Diego, and finally to Mountain View, Arkansas, and she moving with the children from her mother's home to two other towns in California, and then to West Plains, Missouri. Swanson and Thomas had no further contact until 1973, when his mother decided, on her sickbed, to try bringing the estranged couple and their children together again "to make amends." Tr. 61. Thomas's mother wrote to Swanson notifying her that Thomas had suffered a permanently and totally disabling injury on the job in 1970, and that John and Traci were eligible for benefits in connection with Thomas's Social Security disability award. Swanson filed for the children's benefits, and wrote Thomas's mother that she harbored no ill feelings toward the woman. Swanson included photographs of the children and a phone number to reach her. Shortly thereafter, Thomas contacted Swanson, told her himself about the disability benefits the children could receive, and asked to come see the children. Swanson agreed, and a "poignant reunion" ensued, at which Swanson introduced Thomas to John and Traci as "your father." *Prudential Insurance v. Thomas and Swanson, supra,* slip op. at 3 n. 3. John was ten years old at that time.

There is no dispute that following the reunion John developed a close relationship with his father. The parties do not agree about the details of the contacts between father and son, but it is clear that John did stay with his father for some periods during the summers, school-year vacations, and weekends, and that John did receive

some spending money and clothing from his father, in addition to the benefits he derived from his father's disability. Swanson testified that the amount of spending money and clothing that Thomas gave John was meager, and that John was often disappointed because his father would cancel or cut short the visits. However, she does not claim that no visits occurred or that John received no money or clothing from his father. Thomas' version of the visits and gifts is generally corroborated by testimony of Swanson's mother and John's sister Traci. See Tr. 34–35, 119–20, 126, 137–38. Furthermore, the evidence suggests that Swanson may have discouraged the children from visiting their father and speaking with him on the telephone, Tr. 112, 125, 135, 138, 141, and that John may have declined to accept some of the spending money offered him by his father out of fear that his mother would take it away from him and accuse him of stealing, Tr. 46, 126–27. Thomas also testified without contradiction by Swanson that his son called him collect several times, that he sent the children cards and checks for their birthdays, and that he helped John purchase a ten-speed bicycle. Tr. 44–45, 110–11. There may have been "a couple of Christmases" when John and Traci did not receive a present from their father, and Swanson pretended that a package under the tree had come from Thomas. Tr. 96–98. But there is no indication that Thomas never gave the children gifts.

Approximately three months before John's eighteenth birthday, he moved out of his mother's home. Swanson claims that he ran away after throwing a tantrum over her refusal to give him some spending money because he had failed to do certain household chores. Tr. 65, 76. Thomas, Satterfield, and Traci all testified that Swanson kicked John out and later had him arrested when he returned to the home to retrieve his clothes. Tr. 47–48, 109–10, 139–40. Whatever the circumstances of John's departure, there is no dispute that he moved in with his grandmother Satterfield, and that Thomas provided increased support for his son after John left his mother's. Apparently, Thomas and Satter-field discussed how it would be best for John to live with his grandmother during the school year, so as not to uproot him when he was beginning to improve in his studies. Tr. 49. John stayed with his father during the summer months until he graduated from high school at age twenty, and visited "during the year ... [e]very chance he got." Tr. 50, 110.

After graduation, John joined the Navy and designated his father as beneficiary of any unpaid military salary and benefits. According to Satterfield, John and she "had a very serious, long talk," and he made a well-considered decision to name Thomas as the beneficiary. Tr. 112. For whatever reason, John did not designate a beneficiary for the Servicemen's Group Life Insurance policy that the Navy automatically issued on his behalf. Satterfield testified that John had not only discussed with her that he was naming Thomas his beneficiary, "[h]e also told my son, my daughter-in-law, he had talked about it a lot, that his dad was his beneficiary. He— if those papers were not signed, it had to be the Navy's mistake because Johnny honestly believed he had signed them." Tr. 113.

John died in a motorcycle accident on September 23, 1987, just before his twenty-fourth birthday. Prudential Insurance Company of America paid Swanson one-half of the $50,000 life-insurance proceeds, and filed an interpleader suit to determine the proper beneficiary of the other half, which Swanson claims belongs to her as well, rather than to Thomas. By operation of law, since John did not designate a beneficiary for the life-insurance policy, and since he had no spouse or children, the proceeds are to be divided equally between his parents unless one or both of them is disqualified as a parent under § 765(9). 38 U.S.C. § 770(a). Swanson's qualification as a parent is not contested by Thomas.

After a full trial, the Magistrate ruled that Thomas is entitled to one-half of the life-insurance proceeds because he had neither abandoned nor willfully failed to support John during his minority, within the

meaning of 38 U.S.C. § 765(9). Swanson brought this appeal.

## II.

As a threshold matter, we hold that Swanson bears the burden of proving by a preponderance of the evidence that Thomas is disqualified from obtaining benefits under § 765(9). Without express statutory language requiring that a claimant prove his or her case by clear and convincing evidence, we presume the ordinary standard of proof for civil cases—that of a preponderance of the evidence. Section 765(9) of the Servicemen's Group Life Insurance statute provides in relevant part:

> No person who abandoned or willfully failed to support a child during the child's minority, or consented to the child's adoption may be recognized as a parent for the purpose of this subchapter. However, the immediately preceding sentence shall not be applied so as to require duplicate payments in any case in which insurance benefits have been paid prior to receipt in the administrative office ... of sufficient evidence to clearly establish that the person so paid could not qualify as a parent solely by reason of such sentence.

We do not read the second sentence in the above passage to establish a general "clear and convincing evidence" standard. Rather, this sentence creates a protection for insurers in that subset of cases where a party does not contest another party's eligibility until after the insurer has already made payments to the allegedly ineligible parent. In other words, the insurer need not make duplicate payments if the challenging party is tardy in submitting his or her challenge, even though that challenge is supported by sufficient evidence to establish the other's ineligibility clearly.

This special statutory protection for cases where an insurer has already paid benefits before receipt of contesting evidence does not speak to the generality of cases where the insurer faces no risk of making double payments.

We hold, therefore, that the Magistrate applied the wrong standard of proof by requiring Swanson to show Thomas's disqualification by "clear evidence." *Prudential Insurance v. Thomas and Swanson, supra,* slip op. at 6. The Magistrate cited *Prudential Insurance Co. of America v. Ellwein,* 435 F.Supp. 248 (W.D.N.Y.1977), for the clear evidence standard. To the extent that footnote 3 in *Ellwein* might be read to suggest some general burden of showing disqualification by clear and convincing evidence, we disagree with that interpretation of § 765(9).[3] However, we think the reference to the statute's "clear evidence" language is meant only to bolster the point that the burden belongs on the party seeking to oppose an otherwise qualifying party's claim. The text of *Ellwein* suggests the general standard for reviewing § 765(9) challenges: "Ellwein has failed to prove *by a preponderance* of the evidence that defendant Reed failed to support decedent during his minority." *Id.* at 252 (emphasis added).

At any rate, although we hold that the Magistrate here used the wrong burden of proof, we agree with his result after our own examination of the evidence. Swanson has failed to show, even by the less demanding preponderance standard, that Thomas abandoned or willfully failed to support John. And the facts are sufficiently clear to make a remand unnecessary.

## III.

Federal court interpretation of the language in § 765(9), "abandoned or will-

3. Footnote 3 in *Ellwein* states:
The burden of proof is upon the party seeking to oppose the claim of an otherwise qualifying "parent." Although the statute does not expressly place the burden upon such party, it does follow from the operation of 38 U.S.C. §§ 765 *et seq.* In order to file a claim, a "parent" is not required to make an affirmative showing or even an affirmative declaration that he or she did not abandon, fail to support or consent to the adoption of the insured. See, VA form 8283, Claim for Death Benefits. Further, the last sentence of section 765(9) places the burden of showing by clear evidence the disqualification of a "parent" upon a party seeking to bar a payment to a parental claimant.
435 F.Supp. at 252 n. 3.

fully failed to support a child during the child's minority," is relatively scarce. The two federal courts that have had to analyze abandonment have characterized it as "a relinquishment of *all* parental rights in the child ... with an intention that the severance be permanent." *Ellwein, supra,* 435 F.Supp. at 252 (emphasis in original); *Loacano v. Office of Servicemen's Group Life Insurance,* 544 F.Supp. 306, 307 (E.D.Mich. 1982).[4] We adopt this definition, and hold that Swanson has not shown by a preponderance of the evidence such a permanent intent on the part of Thomas.

Swanson acknowledges that the close relationship that developed between Thomas and his son following their reunion in 1973 would readily rebut any claim of abandonment after 1973. Nevertheless, she argues that abandonment occurred when Thomas moved away in 1965 to San Diego and then to Las Vegas. To succeed, then, she must show that Thomas intended at the time he left town to relinquish all parental rights and to sever ties with his son permanently. The evidence in the record simply does not support that conclusion.

Swanson clearly was the one to move out, taking the children with her. By her own admission, she kept Thomas from seeing his son and rebuffed his repeated attempts to rejoin the family. When Thomas tried to contact or locate Swanson by telephone, her mother would hang up on him after saying that she did not know where Swanson was. Later, Thomas could not even reach Swanson's mother, since Satterfield switched to an unlisted telephone

number. Tr. 105. Thomas testified that he had no idea where John was from the time that Swanson disappeared with the children until 1973. Tr. 51.[5]

The strongest evidence Swanson offers to prove Thomas's intent to abandon his son permanently is her testimony that he told her she "would never see or hear from him again, and there was no way that [she] could ever get any support from him for the children because [they] were never legally married." Tr. 60. Even if we assume Swanson's credibility, there are many reasons Thomas may have uttered those words, such as a desperate attempt to persuade Swanson to reconcile. In any event, his subsequent actions belie the words: he came back from Las Vegas to try again to convince Swanson that the family should reunite, after allegedly making the statement quoted above. Her response, as she described it to her mother, was to laugh in his face and "put him on his way." Tr. 134.

■ In evaluating a claim that a parent has abandoned his or her child, we consider the child's minority as a whole. Thus, we take into consideration Thomas's prompt request to see his children once he found out where they were in 1973, and his successful efforts to build a father-son relationship with John from that point on, in evaluating his alleged intent to abandon John permanently in 1965.

Swanson's claim of abandonment is unpersuasive in light of the evidence that Thomas tried many times to reunite the

**4.** A third federal case makes reference to a set of factors considered by a state court interpreting § 765(9) abandonment. *Prudential Insurance Co. of America v. Burns,* 513 F.Supp. 280, 283 (D.Mass.1981), *aff'd,* 676 F.2d 681 (1st Cir. 1982) (citing *Hafley v. McCubbins,* 590 S.W.2d 892 (Ky.App.1979)). While we believe that Thomas would not be disqualified as a parent under these factors, either, we do not adopt them as the test governing claims of abandonment under § 765(9). The issue of abandonment was not directly before the *Burns* Court, because the parents' disqualification was not in issue. Another state court's interpretation of abandonment is similar to that in *Ellwein* and *Loacano:* "conduct on the part of the parent which evinces a settled purpose to forego all parental duties and obligations." *Rahn v. Pru-*

*dential Insurance Co. of America,* 259 N.W.2d 838, 841 (Iowa 1977) (quoting 53 A.L.R.3d 566 (1973)). We are aware of only two cases, federal or state, that have actually found abandonment, however that term is defined, and both of these cases involved a mother who voluntarily gave up her child to a third party (*i.e.,* not the other parent) for fifteen to sixteen years and did not visit or provide support during that period although she knew of the child's whereabouts. See *Burns* and *Hafley, supra.*

**5.** In contrast, although the Magistrate declined to make a factual finding on this point, Swanson admitted that she always knew how to find and contact Thomas, according to both Satterfield and Thomas. Tr. 41, 104.

family following her departure in 1965, that he may have been unable to locate Swanson and the children for approximately six of the eight years of estrangement, and that he formed a close, supportive relationship with his son once family contact was reestablished. Furthermore, we find relevant, although not dispositive, the fact that John designated his father as beneficiary of any unpaid military salary and benefits. Had John felt abandoned by his father, this designation would have been unlikely.

## IV.

Swanson has not shown by a preponderance of the evidence that Thomas willfully failed to support John, either. As with abandonment, we evaluate claims of willful non-support by considering the entire period of the child's minority, which is eighteen years in John's case.[6] See *Ellwein, supra,* 435 F.Supp. at 252. If the period during which the parent provided support is substantial compared to the total years of minority, there is no disqualification under § 765(9). Moreover, the level of support need not have been optimal to count as support. *Ellwein, supra.* Finally, a parent will not be disqualified for periods of non-support that were not the result of willful avoidance of parental responsibility.

Thomas provided support to John during a significant portion of the child's minority—ten out of eighteen years. He supported his son from the time the child was born until approximately age two, when Swanson moved out and took the children with her. He then resumed support when John was ten years old, in the form of disability-related benefits and some spending money, clothing, gifts, visitation, correspondence, and telephone communication.

We reject Swanson's attempt to discount the benefits John derived as a child of a disabled worker. She argues that these payments came from the government and

taxpayers rather than from Thomas, so Thomas should not be credited with providing them. We disagree. Thomas earned those benefits by working over the years prior to an injury that the Social Security Administration deemed permanently and totally disabling. Swanson further argues that when Thomas told her about the children's right to receive disability benefits, his action was gratuitous because he knew that his mother had already alerted Swanson to the children's eligibility, and because Swanson was the one to file for the benefits. Tr. 155–56.[7] Without having to reach the question, we believe that a parent need not affirmatively assist his or her child in receiving benefits in order for those benefits to count as support, so long as the child actually obtains them. However, the fact that Thomas did promptly tell Swanson about the children's eligibility once he knew where she was, helps establish his lack of willfulness during the period of non-support.

Swanson also suggests that the disability benefits ought not to count as support because of this Court's ruling in *Todd v. Norman,* 840 F.2d 608 (8th Cir.1988). In that case, we held that Child's Insurance Benefits resulting from a parent's disability are not "child support payments" within the meaning of 42 U.S.C. § 602(a)(8)(A)(vi), the $50.00 disregard provision in the Aid to Families with Dependent Children (AFDC) program. The holding in *Todd* does not control our result here. The AFDC statute uses the term of art "child support payments" to refer to "a non-custodial parent's *legal* obligation to contribute to the support and maintenance of the children." *Todd, supra,* 840 F.2d at 610 (emphasis in original). Under that statute, AFDC recipients can subtract $50.00 of the child support payments they receive, in calculating the family's resources and corresponding AFDC benefit level. Congress enacted the disregard provision as an incentive for

---

6. Whether Missouri or Arkansas law applies, eighteen is the age of majority. Mo.Ann.Stat. § 211.442(1) (Vernon) (1983 and Supp.1989); Ark.Code Ann. § 9–25–101(a) (1987).

7. Nevertheless, Swanson apparently told a relative "how proud she was that [the children's] daddy thought to help them out that much" by taking steps to get them started on the Social Security benefits. Tr. 145.

AFDC recipients to assist the state in collecting child support payments from absent parents, a rationale not applicable to Social Security benefits, which the state is barred from collecting. *Id.* at 611. Furthermore, "child support" and "Social Security benefits" are distinguished in the legislative history of the AFDC program. *Id.* The Servicemen's Group Life Insurance statute does not use the term of art "child support payments," nor does it have an underlying rationale or legislative history commanding a narrow interpretation of support. The broad language in § 765(9)—"willfully failed to support"—suggests instead that Congress intended courts to consider any form of support that the child derives from the parent. What is at stake here is greater than the $50.00 disregard addressed in *Todd;* a person's claim to parenthood is being challenged. Were we to accept Swanson's argument, no one who is permanently and totally disabled and without resources other than Social Security benefits could qualify as a parent under § 765(9). We cannot accept that harsh and discriminatory outcome.

Given that the Social Security benefits John received as a result of his father's disability do count as support, and that Thomas provided additional forms of support during ten of the eighteen years of his son's minority, we turn now to the eight years of non-support. There is little evidence in the record to prove the willfulness required by § 765(9) for these years. Only Swanson's own testimony indicates any intent on Thomas's part to avoid support. See, *e.g.,* Tr. 60. On the other hand, substantial uncontradicted evidence indicates that Thomas sought to locate Swanson and the children during the period of separation in order to reunite the family, and that Swanson deliberately evaded him and kept him from having contact with the children. Once Thomas lost track of Swanson, he conceivably could have provided support for John via Swanson's mother, Satterfield. But Satterfield also would have been difficult to contact, since she consistently hung up on Thomas, had the police order him to leave her property, and later took an unlisted telephone number. It is not at all clear from the record that Thomas's lack of support for John during the years that Swanson kept the child's whereabouts a secret from Thomas was willful.

Even if a trial court reexamining the evidence under the preponderance standard might conclude what seems to us highly unlikely—that the eight years of non-support were willful—a remand is not necessary here. As a matter of law, we hold that the support Thomas provided during John's entire minority, counting the disability benefits, was sufficient to avoid disqualification for "non-support" under § 765(9). Also, if the period of minority is viewed as a whole, Thomas did not demonstrate an intent to relinquish all parental rights on a permanent basis, and thus did not "abandon" John according to the statute. We affirm the District Court's decision to grant Thomas one-half of the proceeds from the Servicemen's Group Life Insurance Policy of his deceased son, John Vernon Thomas.