Mary Jo **WEBER**

v.

**PRUDENTIAL INS. CO. OF AMERICA, et al.**

No. 3:97CV1803 (JBA).

United States District Court, D. Connecticut.

Oct. 13, 2000.

Frank J. Kolb, Jr., Louis A. Crisci, Jr., David E. Crow, Jr., Kolb & Crisci, East Haven, CT, Noah Eisenhandler, New Haven, CT, Robert B. Flynn, Tyler, Cooper & Alcorn, New Haven, CT, for Plaintiff.

Daniel Green, David J. Baker, Rubenstein, Paige, Stark & Green, Westport, CT, Noah Eisenhandler, New Haven, CT, for Defendant.

## *RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOC. # 34]*

ARTERTON, District Judge.

This case originally arose out of a controversy between Defendant Prudential Insurance Company of America ("Prudential") and Plaintiff Mary Jo Weber ("Weber"). Prudential provided life insurance benefits with a death benefit in the amount

of $200,000 to Weber's son, David Amerine ("David"), a member of the U.S. Navy who was insured under Servicemembers' Group Policy G–32000. *See* Complaint ¶ 5. David died in 1997 and, as he had not named a beneficiary to receive his insurance proceeds, and had neither a widow nor children, the policy stipulated that the proceeds be paid to his parents in equal shares. *See* 38 U.S.C. § 1970. Both Weber and Roy Amerine ("Amerine"), David's father, submitted a claim for the insurance proceeds. On May 30, 1997, Weber filed an objection to Amerine's claim with the Office of Servicemembers' Group Life Insurance. On July 23, 1997, the Office of Servicemembers' Group Life Insurance issued an opinion stating that Prudential should pay one half of the $200,000 proceeds to Weber and one half to Amerine. *See* Complaint ¶¶ 6–10.

After receiving half of the proceeds, Weber instituted this declaratory action against Prudential on August 14, 1997 seeking to collect the remaining portion and alleging that Amerine had "abandoned or willfully failed to support" their son and is therefore not entitled to any payment of his insurance policy pursuant to 38 U.S.C. § 1965(9) (formerly 38 U.S.C. § 765). *See* Complaint ¶ 11.

On January 1, 1998, in its Amended Answer, Prudential filed a counterclaim against Weber and interpleaded Amerine pursuant to 28 U.S.C. § 1335 as claimants to the remaining $100,000 of David Amerine's death benefits. *See* Doc. 16. After Prudential deposited the disputed $100,000 with the Clerk, Prudential's liability was deemed discharged. *See* Consent Judgment, Doc. 40. Before the Court now is counterclaim defendant Amerine's motion for summary judgment on his claim to half of the proceeds from his son's life insurance policy.

## Legal Standard

Rule 56, governing motions for summary judgment, reads in pertinent part, "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56.

The moving party, here defendant Amerine, has the initial burden of establishing the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In assessing the record, all ambiguities and reasonable inferences are to be drawn in favor of the non-moving party. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

The Supreme Court has interpreted the phrase "genuine issue" to mean "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc. .,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It has cautioned that summary judgment is proper only when reasonable minds could not differ as to the import of the evidence. *See id.* at 250–51, 106 S.Ct. 2505. "Material fact" has been interpreted to mean "an essential fact of the nonmoving party's case," *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. 2548; and a "fact that might affect the outcome of the suit," *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

## Legal Discussion

The statute at issue in this case provides that: "[n]o person who abandoned or willfully failed to support a child during the child's minority, or consented to the child's adoption may be recognized as a parent for the purposes of this subchapter." 38 U.S.C. § 1965(9).

Because "abandoned" and "willfully failed to support" are related by the disjunctive "or," not the conjunctive "and," this Court interprets the statute as intending that a person who does *either* of these two things may not be considered a parent under the statute. *See United States v. Gatlin,* 216 F.3d 207, 213 (2d Cir.2000) (in

case construing federal statute, noting use of disjunctive 'or' in determining that series of phrases were independent, not modifiers of each other). The Court will thus analyze the two prongs of this statute separately, to determine whether based on the record before the Court a reasonable fact-finder could determine that Roy Amerine abandoned his son David, or that he willfully failed to support him, within the meaning of the statute. *See Thomas v. Swanson,* 881 F.2d 523, 528–30 (8th Cir. 1989) (conducting separate inquiries to determine whether father abandoned or willfuly failed to support son).

In *Thomas,* the Eighth Circuit affirmed a Magistrate Judge's determination after a full bench trial that the mother had failed to prove that the defendant-father had abandoned or willfully failed to support his son. The court found that the Magistrate had improperly applied the "clear and convincing" standard, but that even under the correct preponderance standard the mother's evidence was insufficient. The facts in *Thomas* that persuaded the Eighth Circuit included the facts that: Swanson, the mother, repeatedly tried to keep Thomas, the father, away from his son; that Thomas tried many times to reunite the family; and that, when Thomas finally located his ten year-old son, Thomas established a "close supportive relationship with him." *Thomas,* 881 F.2d at 528. The *Thomas* court also determined that the mother had not shown by a preponderance of the evidence that Thomas had "willfuly fail[ed] to support" his son, as Thomas had provided financial support to his son for ten out of eighteen years, although much of that support was the result of his children's entitlement to payments under his disability benefits. *Id.* at 529.

Aside from *Thomas,* judicial consideration of the standards under Section 1965(9) has been scant, and the only other court in this circuit to have applied this statute incorporated evidence of financial support into its determination of the element of abandonment. In *Prudential Ins.*

*Co. of America v. Ellwein,* 435 F.Supp. 248 (W.D.N.Y.1977), the court concluded that the facts did not support the finding of abandonment because the father continued to contribute to the financial support of his child and showed interest in his child, despite his infrequent visits. There, the mother had moved the children to California while the father stayed in New York, but the father talked to his children, sent token gifts every Christmas, sent letters and small gifts on other occasions, and, additionally, sent a gift on the occasion of his son's graduation from high school. *Id.,* 435 F.Supp. at 251. *See also Loacano v. Office of Servicemen's Group Life Ins.,* 544 F.Supp. 306 (E.D.Mich.1982) (adopting *Ellwein*'s definition of "abandoned or willfully failed to support" and finding that the combination of defendant's child support payments and the father's admission that she had some contact with the deceased was sufficient to show that mother did not abandon her son).

This Court looks to the cases of *Thomas, Ellwein,* and *Loacano* in giving substance to the terms employed in the statute. As indicated above, however, the use of the disjunctive "or" persuades the Court that a party may be disqualified from parental status under the statute for either abandonment or failure to support. Therefore, to the extent these cases relied on financial support as evidence of non-abandonment, their conclusions are non-dispositive of the issues presented by the instant motion. Further, the Court notes that *Thomas* and *Ellwein* involved factual determinations made after a full bench trial; this procedural distinction will be given due weight. With these principles in mind, the Court turns to an analysis of the two separate standards set out in the statute.

### 1. "Willfully Failed to Support"

■ The Court concludes that no reasonable fact-finder could determine that Amerine "willfully fail[ed] to support" his son financially during his son's minority, even though any monetary support paid by

him was apparently due to a criminal conviction for "willfully and voluntarily abandoning his minor child leaving said child in a dependant condition," and the result of court-ordered child support payments made to the court probation officer. Amerine lived with and supported David for the first four years of David's life, and subsequently paid child support through the court system for the next eleven years. Amerine thus contributed to the support of his son for most of his son's minor life. *See* Amerine's Ex. G, ¶¶ 2–3.

As made clear in *Ellwein,* financial support need not be optimal to surmount the statute's standard of "willfully failed to support." *See Ellwein,* 435 F.Supp. at 252. While Weber urges the Court to discount these payments, as they were ordered by the Georgia court on threat of incarceration, *see* Pl.'s Ex. A, in both *Ellwein* and *Loacano* the successful parents made child support payments under the supervision of some judicial authority. *See id.,* 435 F.Supp. at 250; *Loacano,* 544 F.Supp. at 307. The fact of the criminal conviction itself is not dispositive, as it is not disputed that Amerine pled guilty in 1980, the year of his divorce, and that since this conviction Amerine paid a total of $13,715 in child support payments, representing approximately eleven years worth of payments at the rate of $25 a week. Amerine. Ex. G (Requests for Admission). The statute does not require that a natural parent voluntarily support a child in order to qualify as a beneficiary under a policy; rather, a parent is only disqualified if he or she willfully fails to provide such support. Accordingly, on the undisputed record showing regular child support payments in the amount of $25 a week, no reasonable fact-finder could conclude that Amerine willfully failed to support David. *See Ellwein,* 435 F.Supp. at 252 (finding no willful failure to support where father made sporadic payments that were less than the court-ordered amount, because "[w]hen viewed in the context of the statute and its purpose, a failure to support must be such that it would be substantially comparable in magnitude to abandonment or consent to adoption. Temporary period of non-support or inadequate support are insufficient.").

## 2. "Abandoned"

■ In interpreting the statutory language, this Court is persuaded by the definition of "abandoned or willfully failed to support" employed by the Western District of New York in *Ellwein.* The court there defined "abandoned" as the "relinquishment of all parental rights in the child, including custody, with the intent that the severance be permanent." 435 F.Supp. at 251. After a bench trial, the *Ellwein* court found that the defendant father "did continue to demonstrate some interest in his children," based on evidence that the father sent gifts every Christmas, talked to the children on the telephone, and sent letters and gifts on other occasions. The court excused the infrequency of his contacts by virtue of the fact that the mother had taken the children from the pre-divorce marital abode in New York to California, a substantial distance away. *Id.* at 252.

In *Loacano,* the court granted the absent parent's motion for summary judgment, finding that the custodial parent had failed to create a disputed issue of material fact on abandonment or wilful failure to support. 544 F.Supp. at 307. There, the mother submitted successive orders of the state court concerning visitation rights, demonstrating that she had continued to show an interest in her children and had gone to court to enforce her visitation rights. *Id.* She also submitted a letter from a state agency with which the deceased had been placed, apparently in response to her request for information about her son, further demonstrating her continued interest in his well-being. *Id.* Finally, the plaintiff father conceded that she had had some contact with her son, although he claimed the visits were sporadic at best. Based on these factors, and

the complete lack of testamentary or documentary evidence in support of the father's claim to the contrary, the court concluded that the mother had not abandoned her son, and granted her motion for summary judgment. *Id.* at 308.

Finally, in *Thomas* the Eight Circuit affirmed the magistrate judge's finding, after a bench trial, that the defendant father had not abandoned his son, the insured. The court, citing to *Ellwein,* also analyzed the trial record to determine whether the mother had proved that the father had intended to permanently sever his parental relationship with his son. *Id.,* 881 F.2d at 528. The court concluded that she had not so proved, because the mother had admitted that she kept the father from seeing his son, including such actions as hanging up the telephone when he called, rebuffing his repeated attempts to rejoin the family, and switching to an unlisted telephone number. Most tellingly, the father formed a close relationship with his son once they were reunited, when his son was ten. *Id.* at 528.

The Court finds that the issue of whether Amerine's conduct constituted abandonment of his rights in his son during his son's minority cannot be resolved on this record as a matter of law in Amerine's favor. Amerine's and Weber's divorce agreement provided Weber with full custody of David, with Amerine retaining visitation rights. *See* Amerine's Ex. B. The record viewed most favorably to Weber shows the absence of any visits or contact between Amerine and David from the age of eight to the age of majority (eighteen), only three limited contacts with David between the ages of five to eight, and Amerine's refusal to take David during and subsequent to Weber's hospitalization, resulting in his going into foster care for six months.

Amerine's first visit soon after the 1980 divorce took place when David was about five years old, and Amerine took him for a weekend. *See* Pl.'s Ex. D, Weber Dep. at 86. The second contact, in 1982 or 1983, was the result of David, seven years old at the time, telling his mother that he wanted to see his father. *Id.* at 85. Weber then contacted Amerine and David visited Amerine for a weekend. *See id.* at 85–86. On the third occasion, also when David was seven years old, Amerine dropped off a Christmas present for David but was in a rush because his new wife and daughter were waiting for him in the car. *See id.* at 88. Other than these three instances, all before David was eight years old, the record does not disclose that Amerine ever visited or had any contact with David again during his minority, *see id.* at 89, sent another Christmas present, or sent any birthday presents. *See id.* at 108.

In November, 1984, Weber attempted suicide and was hospitalized for about a week. From November 1984 to May 1985, David was placed under the care of Greg and Margaret Ast, friends of Weber's. *See* Pl.'s Ex. D, Weber Dep. at 65, 68. Before her suicide attempt, Weber tried to contact Amerine and spoke to Amerine's second wife, Gloria. Weber told Gloria that she needed Amerine to take care of David and Gloria said that she would have to talk to Amerine.[1] *See* Pl.'s Ex. D, Weber Dep. at 69–70. After Weber's suicide attempt, Amerine was advised that David was living with the Asts but he made no effort to contact David, visit him, or take over his care in any way. *See id.* at 69. At this time, David's half-sister, Lisa, was taken to live with her father during the period of Weber's recovery. *See id.* at 94.

Amerine asserts that he "sought to exercise [his] court-ordered visitation rights" but Weber moved so frequently that he was unable to visit David. Amerine Aff. ¶ 7. Weber changed residences eleven times between 1980 and 1993 without noti-

---

1. Weber does not remember if she told Gloria the reason she needed Amerine to take David.

*See* Pl.'s Ex. D, Weber Dep. at 69–70.

fying Amerine. *See* Amerine.'s Ex. H, Weber Dep. at 45, 47, 48, 51–52, 56, 58, 63, 72, 75, 76, 77, 81, 117. Weber claims that at the time of each move she did not know where Amerine was living, but the operative statutory section seems to require that a parent give notification of a change in address to the other parent. *See* Amerine's Ex. F (GA St. § 19–9–1). However, the only specificity Amerine offers in support of his contention that he sought to enforce his visitation rights is the assertion that he asked the court clerk for the address to which his child support payments were sent but was refused the address, and that he once asked Weber's aunt for Weber's address, but was refused. *See* Amerine Aff. ¶¶ 7, 9. This contrasts with *Loacano*, where in opposition to summary judgment the defendant mother submitted state court orders demonstrating her repeated attempts to enforce her visitation rights. Without more specificity, it cannot be determined if Amerine's claimed inquiry was within the ten year period of no contact, or if the context of his request for Weber's address from her aunt could be considered an attempt to enforce his visitation rights. Amerine's affidavit is insufficient to dispel the inference that could be drawn by a reasonable factfinder that he had totally relinquished his visitation and custody rights, as manifested by the total lack of any contact or attempted visitation for over ten years.

Amerine's response to the contention that he did not care for David during the period of Weber's suicide attempt does not give any reason as to why he did not or could not provide for the care of his son during any part of this emergency period, or make any effort to visit his son while David was in foster care for six months. *See* Amerine's Reply Brief at ¶ 6. The unbroken absenteeism disclosed in this record and Amerine's apparent willingness to leave David in the care of non-relations for six months could provide the factual predicate for a conclusion that Amerine had intended to totally and permanently relinquish his parental rights, constituting abandonment, and thus forfeited his entitlement to share in David's life insurance proceeds. Whether Amerine made visitation attempts during that period of non-contact which were thwarted, or whether the period of non-contact is otherwise explainable, implicates factual questions as to his intent, which his affidavit and child support payments cannot resolve as a matter of law.

The Court concludes therefore that genuine issues of material fact exist from which a rational fact finder could infer that Amerine "relinquished all parental rights" in his son "with the intent that the severance be permanent." *Prudential Ins. Co. of America v. Ellwein*, 435 F.Supp. 248, 251 (W.D.N.Y.1977).

### Conclusion

Accordingly, Defendant Amerine's Motion for Summary Judgment [DOC. # 34] is DENIED.

IT IS SO ORDERED.